**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| WSOU INVESTMENTS, LLC d/b/a | § | |
| BRAZOS LICENSING AND | § | |
| DEVELOPMENT, | § | |
| | § | CIVIL ACTION No. 6:20-CV-537-ADA |
| Plaintiff, | § | CIVIL ACTION No. 6:20-CV-539-ADA |
| | § | |
| v. | § | |
| | § | |
| | § | |
| HUAWEI TECHNOLOGIES USA INC., | § | |
| *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

I.    U.S. Patent No. 7,860,512 ("the '512 Patent") (Case No. 6:20-cv-00537) ........................ 1

    A.    "capacity" (claims 1-18, 21-24, 27) ................................................................. 1

II.   U.S. Patent No. 8,200,224 ("the '224 Patent") (Case No. 6:20-cv-00539) ........................ 6

    A.    "selecting a first candidate base station using said evaluation of said signal quality from said first measurement report" (claim 1) .................................................................. 6

    B.    "executable program means for causing a base station to perform the method when the program is run on the base station" (claim 15) ........................................................ 10

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*,
   359 F.3d 1367 (Fed. Cir. 2004).............................................................................2

*Baran v. Medical Device Technologies, Inc.*,
   616 F.3d 1309 (Fed. Cir. 2010)...........................................................................2, 4

*Collaborative Agreements, LLC v. Adobe Sys., Inc.*,
   2015 WL 2250391 (W.D. Tex. 2015)..................................................................11

*Computer Docking Station Components, Inc. v. Dell, Inc.*,
   519 F.3d 1366 (Fed. Cir. 2008)...........................................................................9

*Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*,
   412 F.3d 1291 (Fed. Cir. 2005)...........................................................................13

*Edwards Lifesciences LLC v. Cook Inc.*,
   582 F.3d 1322 (Fed. Cir. 2009)...........................................................................1, 2

*Eliyahou Harari et al. v. Roger Le, et al.*,
   656 F.3d 1331 (Fed. Cir. 2011)...........................................................................7, 10

*Function Media, LLC v. Google, Inc.*,
   708 F.3d (Fed. Cir. 2013)....................................................................................12

*Hyperphrase Technologies, LLC v. Google, Inc.*,
   260 Fed.Appx. 274 (Fed. Cir. 2007)...................................................................2

*Medtronic, Inc. v. Advanced Cardiovascular*,
   248 F.3d 1303 (Fed. Cir. 2001)...........................................................................12, 13

*Micro Chem., Inc. v. Great Plains Chem. Co.*,
   194 F.3d 1250 (Fed. Cir. 1999)...........................................................................13

*Omega Engineering, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003)...........................................................................8, 9

*Pavo Solutions LLC v Kingston Technology Company Inc*,
   711 Fed.Appx. 1020 (Fed. Cir. 2017)..................................................................2

*Retractable Tech. v. Becton, Dickinson and Co.*,
   653 F.3d 1296 (Fed. Cir. 2011)...........................................................................1

*Seachange Int'l, Inc. v. C-Cor, Inc.*,
    413, F.3d 1361, 1373 (Fed. Cir. 2005)...................................................................10

*SecurityProfiling, LLC v. Trend Micro America, Inc.*,
    2018 WL 4585279 ..................................................................................................11

*Springs Window Fashions LP v. Novo Industries, L.P.*,
    323 F.3d 989 (Fed. Cir. 2003)...............................................................................10

*VR Optics, LLC v. Peloton Interactive, Inc.*,
    345 F.Supp.3d 394 (S.D.N.Y Nov. 5, 2018).........................................................2

*Wapp Tech Limited Partnership v. Seattle Spinco, Inc.*,
    2020 WL 1983087 (E.D. Tex. April. 27, 2020)...................................................2, 3

*Williamson v. Citrix Online, LLC*,
    792 F.3d (Fed. Cir. 2015).......................................................................................12

*WMS Gaming Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999)..............................................................................13

*Zeroclick, LLC v. Apple Inc.*,
    891 F.3d 1003 (Fed. Cir. 2018).............................................................................11

**Statutes**

35 U.S.C. § 112, ¶ 6 .......................................................................................10, 11, 12, 13

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| Ex. 1 | Appl. Ser. No. 12/648,055, 10/24/2011 Office Action |
| Ex. 2 | Appl. Ser. No. 12/648,055, 01/17/2012 Amendment A |
| Ex. 3 | Appl. Ser. No. 12/648,055, 02/08/2012 Notice of Allowance |

Pursuant to the deadline set forth in the Scheduling Order (Dkt. 34), and the guidelines regarding claim construction set forth in the Order Governing Proceedings in Patent Cases ("OGP") (Version 3.2), Defendants Huawei Technologies USA Inc., *et al*., (collectively, "Huawei") respectfully submit this Responsive Claim Construction Brief to Plaintiff's ("WSOU's") Opening Claim Construction Brief ("Opening Brief") (Dkt. 43).[1]

## I.      U.S. Patent No. 7,860,512 ("the '512 Patent") (Case No. 6:20-cv-00537)

### A.      "capacity" (claims 1-18, 21-24, 27)

| Huawei's Proposed Construction | WSOU's Proposed Construction |
| --- | --- |
| "load" | Plain and ordinary meaning |

The parties' dispute centers on whether "capacity" in the phrases "radio capacity" and "transport capacity" can be construed as "load" where the term "load" itself has been recited in the claim language.  Huawei's proposed construction should be adopted because the patent applicants acted as their own lexicographers by repeatedly equating "capacity" to "load" throughout the entire '512 Patent.  Therefore, "capacity" and "load" in the context of claims 1-18, 21-24, 27 are directed to the same subject matter.  *See Edwards Lifesciences LLC v. Cook Inc.,* 582 F.3d 1322, 1330 (Fed. Cir. 2009) (holding that different terms or phrases can be construed to cover the same subject matter when the intrinsic evidence indicates that such a reading of the terms or phrases is proper).

#### i.      The Specification Repeatedly Equates "Capacity" to "Load"

"Any presumption created by the doctrine of claim differentiation will be overcome by a contrary construction dictated by the written description or prosecution history."  *Retractable Tech. v. Becton, Dickinson and Co.,* 653 F.3d 1296, 1305 (Fed. Cir. 2011) (internal quotation and

---

[1]      This Brief addresses the disputed claim terms (that the parties were collectively permitted to present to the Court for resolution pursuant to the OGP (Version 3.2)) for Case Nos. 6:20-cv-00537 and -00539.

citation omitted); *see also Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004) ("[I]t is not unknown for different words to be used to express similar concepts, even though it may be poor drafting practice"); *Edwards Lifesciences LLC,* 582 F.3d at 1330-31 (finding that the words "graft" and "intraluminal graft" have the same meaning); *Baran v. Medical Device Technologies, Inc.,* 616 F.3d 1309, 1316 (Fed. Cir. 2010) (finding that the terms "detachable" and "releasably" in the same claim have the same meaning); *Hyperphrase Technologies, LLC v. Google, Inc.,* 260 Fed.Appx. 274, 277 (Fed. Cir. 2007) (finding that "data reference," "record reference," "specifying reference," and "reference" have the same meaning); *Pavo Solutions LLC v Kingston Technology Company Inc,* 711 Fed.Appx. 1020, 1028 (Fed. Cir. 2017) (finding that "formed on" and "on" have the same meaning); *Wapp Tech Limited Partnership v. Seattle Spinco, Inc.,* 2020 WL 1983087, at *10-13 (E.D. Tex. April. 27, 2020) (finding that the terms "simulate" and "emulate" in the same claim or in different claims have the same meaning); *VR Optics, LLC v. Peloton Interactive, Inc*., 345 F.Supp.3d 394, 401 (S.D.N.Y Nov. 5, 2018) (finding that "drive" in an independent claim can have the same meaning with "control" in dependent claims and another independent claims and both are used to describe the same function).  Here, the specification repeatedly equates "capacity" to "load."  For example, the specification explicitly recites "[t]he radio ***capacity*** information can be indicated as the ***cell load of the radio cell***" and "[t]he transport ***capacity*** can be indicated as the ***transport load***."  '512 Patent, 8:30-31 and 56-57 and 10:58-61 (emphasis added).  Therefore, "radio capacity" as claimed should mean "radio load," and "transport capacity" as claimed should mean "transport load."

Indeed, the crux of the alleged invention of the '512 Patent is to "make[] it possible for the radio system to take the ***transport load situation*** into account when managing the radio resources of the radio system, e.g. when performing handovers" in order to "***enables load to be balanced between radio cells***, thus making it possible to avoid congestion in advance."  *Id.,* 4:47-50 and 58-

60.   Figure 3 from the '512 Patent illustrates a network configuration, in which the transport resource management unit 300 and the radio resource management unit 301 work together to adjust loads among radio cells provided by BTS (base stations) 326, 328.  *Id.,* 8:25-9:10.

In particular, "[t]he transport resource management unit 300 is configured to receive ***transport load information*** on the transport network 322 available to the radio cells."  *Id.,* 8:41-43 (emphasis added).   "[T]he transport resource management unit 300 could be any entity configured to measure the ***transport load*** of the transport network 322."  *Id.,* 8:51-53 (emphasis added).  Next, it can determine and provide a traffic capacity limit to each BTS 326 and 328 for them to adjust "***cell load***" to "reflect the ***transport load*** of the transport network," especially "[w]hen high ***transport load*** is detected in the connection 313, 314, 315, 317 or 318."  *Id.,* 8:59-60, 9:4-10, and 9:43-44 (emphasis added).  On the other hand, "[t]he radio resource management unit 301 receives information through a connection 312 about radio ***capacity*** of the BTS 326 and the BTS 328, ***reflecting the load of air interface, e.g. radio connections 307, 306 and 308***."  *Id.,* 9:39-42 (emphasis added).  Benefited from the communications between the transport resource management unit 300 and BTS 326 and 328, "[t]he radio resource management unit 301 can now take the ***transport load*** of the transport network into account in autotuning" in order to "***balance load between cells***."  *Id.,* 9:20-23 (emphasis added).  Accordingly, it is apparent that "capacity," either in the phrase "radio capacity" or "transport capacity" as claimed, means "load" in view of the specification.

### ii.      The Doctrine of Claim Differentiation as between Claims 1 and 3[2] is Not Applicable

WSOU asserts that a comparison of claims 1 and 3 shows that "capacity" and "load" cannot

---

[2]      WSOU made a similar claim differentiation argument as between claims 11 and 13.  *See* Opening Brief, at 3.  The same counter-arguments apply.

be interpreted as "load." *See* Opening Brief, at 2-3.  The use of different words implies they have different meaning, but "that implication is overcome where . . . the evidence indicates that the patentee used the two terms interchangeably."  *Baran,* 616 F.3d at 1316.   Here, in both claims 1 and 3, "capacity" means "load" in view of the intrinsic evidence as discussed above.  Huawei's proposed construction would not trigger any application of the doctrine of claim differentiation. For example, claim 3 further limits claim 1 by indicating four specific examples of "radio capacity **information**," including: (1) a current cell load and a maximum radio capacity of the radio cell; (2) the current cell load and available radio capacity of the radio cell; (3) a transport load of the transport network; and (4) the transport load of a connection from one base station of the radio network to another base station of the radio network.  *See* '512 Patent, claim 3 (emphasis added). After applying Huawei's construction, "radio *load* information" as required by claim 1 is not equal to any of the four examples as recited by claim 3 as shown below.

> 3. The method of claim 1, wherein the radio *load* information indicates at least one of a current cell load and a maximum radio *load* of the radio cell, the current cell load and available radio *load* of the radio cell, a transport load of the transport network, the transport load of a connection from one base station of the radio network to another base station of the radio network.

Further, WSOU's argument simply ignores the fact that claim 1 requires "radio capacity ***information***" (a more high-level collective term), not "radio capacity"[3] only.  The features recited in claim 3 are specific examples of "radio capacity ***information***," for example, the ***information*** could be "a current cell load and a maximum radio capacity of the radio cell" or "the current cell load and available radio capacity of the radio cell."  *See id.*  Moreover, solely using "capacity" in claim 1 cannot justify claim differentiation between claims 1 and 3 because "capacity" is also recited by claim 3.

---

[3]      Even if claim 1 requires "radio capacity" only, after applying Huawei's construction, "radio *load*" is still not the same as any of the examples as indicated in claim 3.

###### iii.         The Doctrine of Claim Differentiation within Claim 3 is Also Not Applicable

As to claim differentiation within claim 3, WSOU errs in asserting that both "capacity" and "load" being used in the examples (1) and (2) above indicate that those two words have different meanings.  *See* Opening Brief, at 3.  The term "current cell load" is different from "maximum radio capacity of the radio cell," even though they are arranged in the same example (1) by claim 3.  The specification makes it clear that the example (1) is actually "expressing information on the maximum available capacity of the cell and current load information expressed, for example, as a ***percentage of the maximum capacity***."  '512 Patent, 10:9-11 (emphasis added).  Therefore, "maximum radio capacity of the radio cell" serves as a denominator to calculate the "current cell load" status and so means "maximum radio *load* of the radio cell."  As such, if "capacity" in "maximum radio capacity of the radio cell" does not mean "load," the "current cell load" status cannot be computed.

Similarly, in the example (2), "available radio capacity of the radio cell" also serves as a denominator to calculate the "current cell load" status and so means "available radio l*oad* of the radio cell."  By taking one sentence out of context, WSOU erroneously concludes that "'radio capacity information' includes a parameter that reflects 'available radio *capacity*,' though not necessarily the current *load*."  Opening Brief, at 3 (emphasis in original).  Yet the whole paragraph as listed below suggests that the example (2) also relates to a cell load calculation/indication, and should follow the same equation as used by the example (1).

> The radio capacity information signalled from the BTS to the radio resource management unit can be ***indicated as the cell load of the radio cell***. Typically it comprises parameters expressing information on the maximum available capacity of the cell and current load information expressed, for example, as a percentage of the maximum capacity. ***Alternatively, the radio capacity information may comprise a parameter reflecting the available radio capacity***.

'512 Patent, 10:6-13 (emphasis added).  Accordingly, "capacity" used in the examples (1) and (2) as recited by claim 3 also means "load" as properly construed by Huawei.  Based on the foregoing, "capacity" in the phrases "radio capacity" and "transport capacity" should be construed as "load" in view of the claim language and technical solutions as disclosed in the specification.

II.       **U.S. Patent No. 8,200,224 ("the '224 Patent") (Case No. 6:20-cv-00539)**

The '224 Patent relates to a handover method in a base station of a mobile communication system.  *See* '224 Patent, 1:8-10.  The method involves "initiating a first handover preparation by transmitting a first request" to one "first candidate base station," and if the first handover preparation fails, "selecting a set of candidate base stations" and "initiating a second handover preparation by transmitting a second handover request to a plurality of" candidate base stations.  *Id*. at claim 1.  Such a method "allows a rapid switching to an alternative base station in case that any stage of the handover of the user equipment fails."  *Id*., 2:27-29.  Moreover, by "initiating a multiple handover preparation triggered by an admission failure in the target base station, the base station ensures finding the best possible candidate."  *Id.,* 2:30-36.

A.       **"selecting a first candidate base station using said evaluation of said signal quality from said first measurement report" (claim 1)**

| Huawei's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| "selecting a single candidate base station using said evaluation of said signal quality from said first measurement report" | Plain and ordinary meaning |

WSOU is correct that the parties' dispute regarding this construction is whether or not the use of the phrase "a first candidate base station" should be construed to mean "a single candidate base station."  *See* Opening Brief, at 4.  Contrary to WSOU's assertion, however, the claims and specification of the '224 Patent dictate that the indefinite article "a" in the phrase "a first candidate base station," should be construed to mean "a single," as opposed to the general construction of

"one or more."  *See id*.; *see also Eliyahou Harari et al. v. Roger Le, et al.*, 656 F.3d 1331, 1341 (Fed. Cir. 2011) ("When the claim language and specification indicate that 'a' means one and only one, it is appropriate to construe it as such even in the context of an open-ended 'comprising' claim.").

The claims of the '224 Patent support construing "a" to mean one and only one.  *See, e.g.*, '224 Patent, claim 1 (requiring the step of "selecting a first candidate base station," and then the step of "initiating a first handover request to . . . said first candidate base station."); claim 2 ("[t]he method of claim 1, wherein said first handover preparation has failed, if a failure message is received from said first candidate base station . . . .").  As shown above, the phrase "a first candidate base station" is used in the singular, rather than the plural form in the claim language of both claims 1 and 2.

Additionally, the claim language indicates that the patentees knew how to claim both a single and multiple base stations where they intended to do so.  *See id.,* claim 1, (explaining that the first measurement report contains an evaluation of signal quality from ***at least one*** candidate base station of said plurality of base stations for a handover); *see also* 9:33-39 (explaining that the second measurement report contains a second evaluation of signal quality of ***at least one*** of said set of candidate base ***stations***, and the plurality of candidate base ***stations*** for said second handover preparation includes ***at least one*** of said candidate base ***stations*** identified in said second measurement report).  Thus, the claims require that a single base station is selected as a first candidate base station, a handover is initiated to the selected base station, and if that handover fails, then the base station sends plural handover preparations to plural base stations.

The specification of the '224 Patent further supports construing "a first candidate base station" as "a single candidate base station."  *See id*., 4:18-22 ("In a second step 102, a first

candidate base station is selected using the evaluation of the signal quality from the first measurement report. The evaluation may indicate that the first candidate base station **has the highest** signal strength for the user equipment.") (emphasis added); *see also* 5:4-8 ("In a first instance, the source base station 202 transmits a first handover request to a first candidate base station 205. The candidate base station 205 may correspond to the candidate base station from the list that **has the strongest** signal for the user equipment 201.") (emphasis added); 2:37-39 ("the first handover preparation has failed if a failure message is received from the first candidate base station").

Each and every reference in the specification to "the first candidate base station" relates to the selection of a **single** candidate base station – there is no disclosure in the '224 Patent that "the first candidate base station" could be more than one base station. *See, e.g.*, Abstract ("selecting **a** first candidate base station . . . initiating a first handover preparation by transmitting a first request to **the** first candidate base station") (emphasis added); *see also* 1:64-67 ("selecting **a** first candidate base station . . . and initiating a first handover preparation by transmitting **a** first request to **the** first candidate base station") (emphasis added).  It is only after the failed handover request to the first base station that the specification suggests that more than one base station can be employed.  *See id.*, 4:21-35 (explaining that should the first handover request fail a "set of candidate base stations" can be selected and a second handover attempted).

In addition, the prosecution history supports Huawei's argument that the first handover preparation sent to the "first candidate base station" should be limited to a handover preparation sent to a "single" candidate base station.  Prosecution disclaimer attaches to a term "where the patentee has unequivocally disavowed a certain meaning to obtain his patent."  *Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003).  The doctrine narrows

the meaning of the claim congruent with the scope of the surrender.  *See id.*   In this case, the prosecution history disclaimer arose with respect to the Kim prior art reference (U.S. Patent No. 7,818,006).  *See* Ex. 1, "Appl. Ser. No. 12/648,055, 10/24/2011 Office Action," at 2.  Just like the '224 Patent, Kim pertains to handover methods in base stations.  *Id.,* at 4.  The patent examiner noted during an office action rejection that Figure 6 of Kim disclosed handover processes in selected base stations, and that if the first handover preparation failed, there would be a second handover preparation to a base station selected from a set of candidate base stations.  *Id.*

Even though Kim was raised by the examiner with regards to the "second handover" aspect of then pending claim 1, the patent applicants' statements go further.   Specifically, in order to overcome the examiner's rejection of what would eventually issue as claim 1 in view of Kim, the patent applicants discussed Figure 6 of Kim and the examiner's claim that it described a second handover preparation.  *See* Ex. 2, "Appl. Ser. No. 12/648,055, 01/17/2012 Amendment A," at 8 .  In distinguishing Kim, the applicants represented that "the subject matter of claim 1 attempts an initial handover preparation to a ***single*** selected target base station when a determination is made that a handover is needed, assuming it will be successful, and sends plural handover preparation messages to ***plural*** candidate base stations if the initial handover preparation attempt fails."  *Id*. (emphasis added).

Following these representations, the pending claims of the '224 patent were allowed.  *See* Ex. 3, "Appl. Ser. No. 12/648,055, 02/08/2012 Notice of Allowance".  As such, in view of the repeated and unequivocal statements reproduced above, the patent applicants disavowed any claim construction (such as the present "plain and ordinary meaning") where the "first candidate base station" could mean "more than one" base station.  *See Computer Docking Station Components, Inc. v. Dell, Inc.*, 519 F.3d 1366, 1379 (Fed. Cir. 2008) (finding disavowal of claim scope where

"the sum of patentees' statements during prosecution would lead a competitor to believe that the patentee had disavowed coverage of laptops"); *Seachange Int'l, Inc. v. C-Cor, Inc.*, 413, F.3d 1361, 1373 (Fed. Cir. 2005) (finding disclaimer where the applicant argued during prosecution that "illustrative" claim did not disclose features of prior art); *Springs Window Fashions LP v. Novo Industries, L.P.*, 323 F.3d 989, 996 (Fed. Cir. 2003) (finding disclaimer where the applicant made consistent and repeated arguments distinguishing the prior art from the claimed invention).

As the plain language of the claims, the specification, and the patent applicants' statements made during the prosecution history indicate that the indefinite article "a," when used in the context of the term "a first candidate base station," means "a single candidate base station," rather than multiple candidate base stations, Huawei's proposed construction, which correctly recognizes this fact, should be adopted.  *See Eliyahou Harari*, 656 F.3d at 1341.[4]

**B.** **"executable program means for causing a base station to perform the method when the program is run on the base station" (claim 15)**

| Huawei's Proposed Construction | WSOU's Proposed Construction |
|---|---|
| Subject to 35 U.S.C. § 112, ¶ 6<br><br>Function: causing a base station to perform the method of claim 1 when the program is run on the base station<br><br>Structure: The flow chart of Figure 1, and its accompanying written description, and equivalents thereof | Plain and ordinary meaning; and does not invoke 35 U.S.C. § 112, ¶ 6.  If the Court finds the term invokes § 112, ¶ 6, however, then:<br><br>Function: causing a base station to perform the method of claim 1.<br><br>Structure: executable program code configured when executed to cause the base station to perform the method of claim 1; the example flowchart shown in Fig. 1 and its accompanying written description; example signaling described with reference to Figs. 2-4; the example selecting process described with reference to Fig. 5; the base station |

---

[4]    For these reasons there is no contradiction between construing the "first base station" and not the "first measurement report."  Opening Brief, at 4.  There is no logical requirement in the claim that there must be a *single* measurement report, and the claim distinguishes between a "first measurement report" and "second measurement report."

| | described with reference to Fig. 6; and equivalents of any of the foregoing. |
|---|---|

The parties have a number of disputes regarding this claim limitation.  As an initial matter, the parties dispute whether the term is a means-plus-function term and thus should be construed pursuant to 35 U.S.C. § 112, ¶ 6.  If such is the case, which Huawei contends, the parties dispute the proper corresponding structure that is clearly linked to and accomplishes the claimed function.

WSOU makes two primary arguments.  First, WSOU argues that the generic computer language of "executable program" is by itself enough to recite sufficient structure.  *See* Opening Brief at 5-6.  Second, WSOU argues that the language of claim 15 – "causing a base station to perform the method when the program is run on the base station" – denotes sufficient structure because of its reference back to the method of claim 1.  *See id*.  Both of WSOU's arguments are flawed.

WSOU's contention that "executable program" by itself denotes sufficient structure is undercut by the cases WSOU itself cites.  Specifically, in ***none*** of the cases cited by WSOU did the claim terms WSOU identified include the word "means" in conjunction with the purportedly generic computer language.  *See e.g., Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1005-06 (Fed. Cir. 2018) (showing no presence of the word "means" in the asserted claims containing the "program" and "interface code" limitations); *Collaborative Agreements, LLC v. Adobe Sys., Inc.*, 2015 WL 2250391, at *10 (W.D. Tex. 2015) (illustrating that the phrase "code segment" in asserted claim 25 does not contain the word "means"); *SecurityProfiling, LLC v. Trend Micro America, Inc.*, 2018 WL 4585279, at *2 (noting that none of the disputed terms uses the word "means"); *Syncpoint Imaging, LLC v. Nintendo of Am., Inc.*¸2016 WL 55118, at *22 (indicating that the words "means" does not appear in the claims with the limitations "instructions for detecting" or "instructions for processing).

In addition, despite WSOU's contentions to the contrary, claim 15, when read as a whole, claims an unknown algorithm or structure contained within the "executable program" that is capable of performing the method of claim 1. *See Function Media, LLC v. Google, Inc.*, 708 F.3d, 1310, 1318 (Fed. Cir. 2013) (holding that the specification must disclose an algorithm for performing the function in enough detail to explain how the function is performed). This kind of claim is the very definition of functional claiming – claiming based on what something does, rather than what something is. The presumption that a term is or is not means-plus-function focuses on whether or not the claim term contains the word "means," not ***where*** that word exists within the claim. *See Williamson v. Citrix Online, LLC*, 792 F.3d, 1339, 1348 (Fed. Cir. 2015). It is WSOU's burden to overcome the presumption that the term is governed by § 112, ¶ 6, and WSOU has failed to do so.

As this claim term is clearly one thus must construed pursuant to § 112, ¶ 6, it is necessary to look to the specification of the '224 Patent to determine what algorithm is clearly linked to and accomplishes the claimed function (i.e., "causing a base station to perform the method of claim 1 when the program is run on the base station"). Here, the only algorithm disclosed in the specification capable of causing a base station to perform the claimed handover method is the algorithm of Figure 1. *See* '224 Patent, 4:9-61 (describing FIG. 1 and the flowchart 100 of the claimed handover method).

WSOU arguments regarding corresponding structure are legally incorrect, as WSOU identifies a number of "exemplary" structures that "encompass various embodiments" that may or may not be necessary. *See* Opening Brief, at 7. However, the proper analysis is to determine what structure is clearly linked to and accomplishes the function recited in the claim. *See Medtronic, Inc. v. Advanced Cardiovascular,* 248 F.3d 1303, 1311 (Fed. Cir. 2001). It is not, as WSOU

- 12 -

insinuates, identifying structures that are *optional* or that *may be capable* of performing the claimed function.  *See id.*  To satisfy § 112, ¶ 6, the corresponding structure "must include all structure that actually performs the recited function."  *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005).  Moreover, the "corresponding structure" must not include structures beyond those necessary to perform the claimed function.  *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

As an example of the impropriety of WSOU's proposed structure, WSOU contends that "the base station described with reference to Figure 6" is necessary structure.  Opening Brief, at 7.  Yet it is nonsensical that a physical embodiment of a ***base station*** could be "implemented in a computer program stored on a storage medium," as required by claim 15. *See e.g., '224* Patent, 10:58-59 ("The method of claim 1 implemented in a computer program product stored on a storage medium").  This example only serves to demonstrate that WSOU's "exemplary" corresponding structures are anything but.

Indeed, according to the claim language itself, this particular means-plus-function limitation is implemented by computer software.  As such, the corresponding structure in the patent specification must include an algorithm for performing the function.  *See WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999) (finding that when disclosed structure is a computer or microprocessor programmed to carry out an algorithm "the disclosed structure is not the general purpose computer, but rather the general purpose computer programmed to perform the disclosed algorithm").  Here, that algorithmic function is described pictorially with respect to Figure 1.  As such, WSOU's attempt to incorporate components such as "signaling hardware" and a "base station" are improper and should be rejected.  Only Huawei's proposed construction identifies the proper corresponding structure and, as such, should be adopted by the Court.

Dated:  March 5, 2021                       Respectfully submitted,

                                        */s/ Jason W. Cook*
Jason W. Cook
Texas Bar No. 24028537
Shaun W. Hassett
Texas Bar No. 24074372
**McGuireWoods LLP**
2000 McKinney Avenue, Suite 1400
Dallas, TX 75201
Telephone: (214) 932-6400
jcook@mcguirewoods.com
shassett@mcguirewoods.com
Tyler T. VanHoutan
Texas Bar No. 24033290
**McGuireWoods LLP**
600 Travis St., Suite 7500
Houston, TX 77002
Telephone: (713) 571-9191
tvanhoutan@mcguirewoods.com

J. Mark Mann
Texas Bar No. 12926150
G. Blake Thompson
Texas Bar No. 24042033
**MANN | TINDEL | THOMPSON**
300 West Main Street
Henderson, Texas 75652
Telephone: (903) 657-8540
mark@themannfirm.com
blake@themannfirm.com

*Counsel for Defendants Huawei Technologies Co., Ltd., Huawei Technologies USA, Inc., Huawei Device Co. Ltd. (f/k/a Huawei Device (Dongguan) Co.), Huawei Device (Shenzhen) Co., Ltd. (f/k/a Huawei Device Co. Ltd.) and Huawei Device USA*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

_/s/ Jason W. Cook_____
Jason W. Cook
